UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PEARLINE BOOTH,

                        Plaintiff,

              -v.-

FIRST RELIANCE STANDARD LIFE
INSURANCE COMPANY,

                        Defendant.

24 Civ. 3927 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

In 2017, Plaintiff Pearline Boothe sustained severe injuries in an automobile collision. From 2018 to 2023, Defendant First Reliance Standard Life Insurance Company, which provides a long-term disability insurance policy to Plaintiff's employer, paid disability benefits to Plaintiff. But after determining that Plaintiff no longer qualified for those payments, Defendant terminated them in 2023. Plaintiff unsuccessfully appealed that decision to Defendant and eventually brought this case in federal court under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1191c, 1202-1242, 1301-1461, to recover the long-term disability benefits she believes she is owed. Before the Court are the parties' cross-motions for summary judgment. For the reasons that follow, the Court grants Plaintiff's motion and denies Defendant's motion.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    Plaintiff's Disability

On December 7, 2017, Plaintiff was involved in an automobile collision that caused injuries resulting in severe "low back, bilateral hip, and bilateral lower extremity pain." (Def. 56.1 ¶ 12 (alteration adopted)). Plaintiff's initial diagnoses included "intervertebral disc disorder with myelopathy [in the] lumbar region and lumbar spondylosis with radiculopathy." (*Id.* ¶ 13 (alteration adopted)). Plaintiff also developed right shoulder pain that limited range of motion and use. (*Id.* ¶ 14).

---

[1]    The facts set forth in this Opinion are drawn from the parties' submissions in connection with their cross-motions for summary judgment. The Court primarily sources facts from the administrative record (Dkt. #33-1 to -38 ("AR")), Plaintiff's Local Civil Rule 56.1 Response to Defendant's Rule 56.1 Statement (Dkt. #37-1 ("Pl. 56.1")), and Defendant's Local Civil Rule 56.1 Response to Plaintiff's Rule 56.1 Statement (Dkt. #40-2 ("Def. 56.1")).

Citations to a party's Local Rule 56.1 Statement incorporate by reference the documents and testimony cited therein. Where a fact stated in a party's Rule 56.1 Statement is supported by evidence and controverted only by a conclusory statement by the opposing party, the Court finds that fact to be true. *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be submitted by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."). Where Plaintiff agrees to a fact set forth in Defendant's Local Rule 56.1 Statement in its entirety, the Court cites only to Defendant's Local Rule 56.1 Statement.

For ease of reference, the Court refers to Plaintiff's memorandum of law in support of her motion for summary judgment as "Pl. Br." (Dkt. #30); to Defendant's memorandum of law in opposition to Plaintiff's motion and in support of its cross-motion for summary judgment as "Def. Br." (Dkt. #34-2); to Plaintiff's memorandum of law in further support of her motion and in opposition to Defendant's cross-motion as "Pl. Reply" (Dkt. #37); and to Defendant's memorandum of law in further support of its cross-motion as "Def. Reply" (Dkt. #40).

Prior to her accident, Plaintiff had worked for more than a decade as a registered nurse for Montefiore Medical Center, which was a "medium exertion occupation." (Def. 56.1 ¶ 1; Pl. 56.1 ¶ 8). But Plaintiff could not return to her job following the accident, so she filed claims with Defendant for long-term disability benefits. (Def. 56.1 ¶¶ 15-16). Defendant approved her for these benefits on May 16, 2018. (Pl. 56.1 ¶ 13).

### 2.    Defendant's Long-Term Disability Insurance Policy and Its Terms

Plaintiff received these benefits because she was enrolled in Montefiore's group welfare benefit plan. (*See* Def. 56.1 ¶ 3). Montefiore's plan was insured in part by a group long-term disability insurance policy sold by Defendant to Montefiore (the "Policy"). (*Id.*). The Policy provided Montefiore's eligible employees with monthly income replacement benefits for "Total Disability from Sickness or Injury." (Pl. 56.1 ¶ 2; Def. 56.1 ¶ 5). For an employee to be eligible for these benefits, in addition to being "Totally Disabled as the result of a Sickness or Injury covered by this Policy," the employee had to (i) be "under the regular care of a Physician, (ii) "ha[ve] completed the Elimination Period," and (iii) submit[ ] satisfactory proof of Total Disability to [Defendant]." (AR 17). The Elimination Period is "90 consecutive days of Total Disability" that "begins on the first day of Total Disability" and during which "no benefit is payable." (Pl. 56.1 ¶ 7).

The definition of Total Disability was more dynamic. "[D]uring the Elimination Period and for the first 60 months for which a Monthly Benefit is payable," the Policy defined Total Disability to mean that "an Insured cannot

perform the material duties of his/her *regular occupation*." (Def. 56.1 ¶ 6 (emphasis added)).  "[A]fter a Monthly Benefit has been paid for 60 months," however, an employee was Totally Disabled only if they "cannot perform the material duties of *any occupation*." (*Id.* (emphasis added)).  "Any occupation is one that the Insured's education, training or experience will reasonably allow." (AR 9).  The Policy provided that Defendant had "the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits." (*Id.* at 13; *see also* Def. 56.1 ¶ 7).  And the Policy committed that "[w]hen [Defendant] receive[s] written proof of Total Disability covered by this Policy, we will pay any benefits due." (AR 13).

### 3.    Defendant Approves Plaintiff for Long-Term Disability Benefits

To prove her Total Disability and obtain benefits under the Policy, Plaintiff submitted an application to Defendant that included an attending physician statement by her pain management specialist, Dr. Sireen Gopal. (*See* Pl. 56.1 ¶¶ 9-13).  Plaintiff reported in her application that she was unable to work "due to right back pain radiate to right thigh" and "pins and needles [and] pain in [her] feet." (*Id.* ¶ 9 (alterations adopted and internal quotation marks omitted)).  Dr. Gopal diagnosed Plaintiff with "intervertebral disc disorders with myelopathy [in the] lumbar region." (*Id.* ¶ 11).  Dr. Gopal confirmed that Plaintiff's symptoms included "lower back [pain] radiating down the bilateral legs to the feet" and observed "tenderness" in certain regions of her spine as well as a "limited" range of motion.  (AR 503).  Dr. Gopal concluded that Plaintiff was capable of sedentary work.  (Pl. 56.1 ¶ 12; *see also* AR 504

(reporting that Plaintiff could "occasional[ly]" bend, squat, climb, reach above shoulder level, kneel, crawl, use foot controls, and drive and, further, that over an eight-hour day, Plaintiff could alternatively sit, stand, walk, and drive for one to three hours each)).

Based on Plaintiff's medical records and the then-applicable "regular occupation" definition of Total Disability, Defendant concluded that Plaintiff was incapable of performing the medium exertion duties of her regular occupation as a nurse at Montefiore and approved her claim for disability benefits retroactive to March 7, 2018.  (*See* Pl. 56.1 ¶¶ 13-14).

### 4.    Defendant Conducts Regular Medical Reviews

Under the Policy, "the Monthly Benefit will stop on the earliest of the date the Insured fails to furnish the required proof of Total Disability."  (Pl. 56.1 ¶ 23).  The Policy also provided that Defendant had the right, at its own expense and "as often as it is reasonably required," to have a benefits claimant medically examined "to determine the existence of any Total Disability which is the basis for a claim."  (AR 13).

Exercising its right under the Policy to confirm Plaintiff's Total Disability, Defendant had its employee, Registered Nurse Heather DiFalco, review the medical evidence on May 3, 2018.  (*See* Def. 56.1 ¶ 22).  Ms. DiFalco confirmed that Plaintiff remained Totally Disabled through July 31, 2018.  (*See id.* ¶ 25). She noted that Plaintiff had been out of work since December 7, 2017, with increasing low back, bilateral hip, and bilateral lower extremity pain due to diagnoses of intervertebral disc disorder with myelopathy in the lumbar region

and lumbar spondylosis with radiculopathy.  (AR 209).[2]  She concluded that Plaintiff's medical records supported a "lack of consistent work function at any exertional level."  (Def. 56.1 ¶ 25 (alteration adopted)).

On September 10, 2018, Ms. DiFalco performed a follow-up review.  She again concluded that Plaintiff "continues to lack consistent work function at any exertional level."  (Def. 56.1 ¶ 36).  She expressed "a guarded prognosis for return to prior level of functioning" and recommended obtaining updated medical records from Plaintiff's providers "[a]s needed."  (Id.).

Nearly one year later, on August 5, 2019, Defendant sought a second opinion from Registered Nurse Angela D. Balderama.  (Def. 56.1 ¶ 37; AR 211).  Ms. Balderama confirmed Ms. DiFalco's previous conclusions.  "Based on review of updated medical records," Ms. Balderama wrote, "it appears claimant is precluded from frequent sit, stand, walk, any lift, stooping, bending, twist, climb stairs ongoing due to persistent chronic low back pain radiating to bilateral lower extremities from hips to feet."  (Def. 56.1 ¶ 39).  These observations led Ms. Balderama to determine that Plaintiff's "[p]rognosis to prior level of work function appears doubtful given significant functional limitation due to pain."  (Id.).  Ms. Balderama did note, however, that Plaintiff "continues with conservative measures with slow progress," so, like Ms. DiFalco, she provided a tepid prognosis: "Future Sedentary is guarded."  (Id.).

---

[2]    The copy of Ms. DiFalco's notes provided to the Court contains a formatting error resulting in the omission of many letters from each sentence.  But the Court can deduce the substance of these notes by comparing this entry to a later one.  (Compare AR 209, with AR 210 (appearing to copy and paste the portion of the note described above)).

### 5.    Plaintiff Is Awarded Social Security Disability Benefits

On December 10, 2019, an Administrative Law Judge ("ALJ") approved Plaintiff's application for Social Security disability benefits.  (AR 847-51).  The ALJ determined that Plaintiff had "been under a disability as defined in the Social Security Act" since her car crash on December 7, 2017.  (*Id.* at 849). Plaintiff was thus "unable to perform any past relevant work," because the "demands of [that work] exceed[ed] [her] residual functional capacity."  (*Id.*). Plaintiff had the residual functional capacity to perform sedentary work (*id.* at 847 (further finding that Plaintiff "can occasionally crouch," "never crawl," and "can reach with the right upper extremity frequently — yet never overhead")), but she was nevertheless entitled to Social Security disability benefits because there were "no jobs that exist[ed] in significant numbers in the national economy that [she could] perform" (*id.* at 849).

Defendant had encouraged Plaintiff to seek Social Security benefits, including by paying its agent to represent her throughout the process at no cost to Plaintiff.  (Def. 56.1 ¶¶ 41-42).  Defendant explained to Plaintiff that it was "often in the best interests of our claimants to receive [Social Security Disability Insurance] benefits."  (*Id.* ¶ 43).  At the same time, it was also in Defendant's interests because the Policy permitted Defendant to reduce Plaintiff's long-term disability benefits "by the amount of certain Social Security benefits which you may be eligible to receive, including (but not limited to) [Social Security Disability Insurance] benefits."  (*Id.*).

Plaintiff began receiving her Social Security benefits effective June 2018. (Def. 56.1 ¶ 45). These benefits created an overpayment of $45,568. (*Id.* ¶ 47). So, pursuant to a back-pay provision in the Policy, Plaintiff agreed to send Defendant a check for $35,000 on February 14, 2020, and then repay the remaining balance of $10,568 in equal installments over the next 12 months. (*Id.* ¶ 48; *see id.* ¶¶ 46-47).

### 6.    Defendant Terminates Plaintiff's Long-Term Disability Benefits Under the Policy

On October 4, 2022, Registered Nurse Madeleine Montoya conducted a review of Plaintiff's medical files accumulated over the prior three years and determined that Plaintiff's disability no longer interfered "with all work capacity." (AR 213; Def. 56.1 ¶ 55). Specifically, Ms. Montoya observed that Plaintiff's symptoms had not worsened and, in some cases, had improved. Ms. Montoya wrote that "there was no noted escalation of care for the last 3 years[,] as [the] same medications ha[ve] been refilled, there was no referral to surgery[,] and there was no documentation [that Plaintiff] was seen in urgent care/ER for exacerbation of symptoms." (AR 213). Because Plaintiff "reported that her pain has improved 80% since having last Lumbar [radiofrequency ablation] done 03/24/2022," and an "exam for both shoulders & back were both normal," Ms. Montoya determined that "updated records no longer support that the severity of [Plaintiff]'s reported symptoms rise to a level of impairment interfering with all work capacity." (*Id.*). So, "[b]ased on available medical information," Ms. Montoya concluded that Plaintiff was "capable of at least light level of exertion from a physical standpoint as of 04/25/2022." (*Id.*).

Soon after Ms. Montoya's review, on December 12, 2022, Defendant advised Plaintiff by letter that it would terminate her benefits under the Policy effective March 7, 2023.  (AR 472-75; *see also* Pl. 56.1 ¶ 31).  Defendant reminded Plaintiff that the definition of whether she qualifies as Totally Disabled under the Policy changes after 60 months.  (AR 473).  For the first 60 months, Defendant advised Plaintiff, the "definition of Total Disability require[d] us to look at if you are incapable of working the occupation you had when you went out of work."  (*Id.*).  After 60 months, though, the inquiry became whether Plaintiff was "Totally Disabled from working at any occupation that you are qualified to perform."  (*Id.*).  Relying on Ms. Montoya's review that "determined [Plaintiff] would be capable of working up to a light physical demand level occupation," as well as findings by Defendant's vocational team that Plaintiff would be capable of a light occupation as an "Office Nurse, School Nurse, Occupational Health Staff Nurse, Hospital Admitting Clerk, Cardiac Monitor Technician[,] [or] Telephone Triage Nurse,"[3] Defendant informed Plaintiff that "as of March 7, 2023, you will no longer meet the definition of Total Disability and per the Termination of Monthly Benefits provision, your claim has been closed."  (*Id.*).

---

[3]    The first three of these positions are classified as light exertion; the second three are classified as sedentary.  (AR 1289; *see also id.* at 1291 (noting that jobs categorized as light exertion can involve, among other things, "[e]xerting up to 20 pounds of force occasionally, and/or 10 pounds of force frequently (one-third to two-thirds of the time), and for a negligible amount of force constantly (two-thirds or more of the time) to move objects")).

### 7.    Plaintiff Internally Appeals

On December 6, 2023, Plaintiff, through counsel, appealed Defendant's termination of benefits.  (Def. 56.1 ¶ 61).  *See* 29 C.F.R. § 2560.503-1(h)(1) ("Every employee benefit plan shall establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan[.]").  Ms. Montoya performed a second review of additional records on December 11, 2023, but her conclusion remained the same.  (Def. 56.1 ¶¶ 65-66).  Although additional clinical records documented Plaintiff's "limited shoulder motion and positive impingement signs," the records nonetheless "support[ed] that [Plaintiff was] limited to a sedentary level of work function with [restrictions and limitations] of no reaching & working overhead."  (*Id.*).

On December 15, 2023, Defendant acknowledged receipt and internal assignment of Plaintiff's appeal.  (Def. 56.1 ¶ 67).  On December 20, 2023, Defendant obtained a file review from Dr. Shannon Blackmer.  (*Id.* ¶ 68).  Dr. Blackmer concluded that Plaintiff could only lift up to five pounds occasionally, could occasionally use her upper extremities for reaching at desk level, could rarely use her right upper extremity to lift above the shoulder, and could walk for 15 minutes at a time for a total of 30 minutes.  (*Id.* ¶ 69).

On January 18, 2024, Defendant notified Plaintiff that, although it was ordinarily required to decide her appeal within 45 days, it would take longer to decide because it was "awaiting the independent medical review."  (AR 484).  Defendant had sought clarification from Dr. Blackmer on certain of the doctor's

findings.  (Def. 56.1 ¶ 71).  Plaintiff argues that Defendant had to seek clarification in order to reconcile Dr. Blackmer's findings that Plaintiff could occasionally reach at desk level and rarely reach above her shoulder with Defendant's determination that Plaintiff no longer met the definition for Total Disability because she could work a light-physical-demand-level occupation. (Pl. Br. 13).  On January 25, 2024, Dr. Blackmer confirmed that even though Plaintiff could only reach at desk level occasionally, she was able to type frequently.  (Def. 56.1 ¶ 72; AR 221).

On January 26, 2024, Defendant provided Plaintiff's counsel with its independent physician's review and its vocational review.  (AR 486).  Counsel requested additional information from Defendant on February 6, 2024.  (Def. 56.1 ¶ 75).  Specifically, counsel sought the information that Defendant's vocational expert relied on to determine Plaintiff's lifting capacity.  (*Id.* ¶ 76). Counsel explained that Defendant's providers "indicated [Plaintiff] could only lift 5 pounds occasionally, but [Defendant's] vocational expert stated she could perform sedentary work." (*Id.*).  That made "no sense" to counsel, because he was "unaware of any standard guidelines that permit a lifting capacity of less than 10 pounds to qualify for sedentary work." (*Id.*).  Defendant responded to counsel's inquiry:  "[O]ur vocational team uses software Oasys and skill Tran which uses information obtained from the dictionary of occupational titles which has exertional/strength levels as defined by the Department of Labor." (*Id.* ¶ 77).

On March 5, 2024 — 90 days after Plaintiff submitted her appeal — Defendant sent Plaintiff a second letter again informing her that it would take longer than 45 days to decide her appeal because it was "awaiting [Plaintiff's] response to the independent medical review." (Def. 56.1 ¶¶ 81-82; AR 488).

On March 26, 2024 — 111 days after Plaintiff submitted her appeal — Defendant rendered its final decision to deny Plaintiff's appeal and terminate her long-term disability benefits (the "Decision"). (Def. 56.1 ¶ 83; AR 490-96). Defendant explained that its Decision relied on independent medical reviews by Dr. Blackmer and a psychiatrist, Dr. Elena Dlugach. (AR 492). Both doctors concluded that Plaintiff's functional limitations were insufficient to prevent her from working starting March 7, 2023. (*Id.* at 492-93). Defendant's Decision also relied on its vocational specialist's determination that Plaintiff had the "capacity to perform [certain] sedentary occupations." (*Id.* at 493).

At the same time, Defendant's Decision acknowledged that Defendant had "needed clarification" from Dr. Blackmer about whether Plaintiff could use a keyboard given that she could "only occasionally use her right upper extremities and frequently use her left upper extremities." (AR 493). Dr. Blackmer subsequently clarified that Plaintiff could "frequently (34-66%) keyboard with both right and left hands." (*Id.*).

Finally, Defendant distinguished the Social Security Administration's determination that Plaintiff was entitled to disability benefits. (AR 495). Defendant explained that although it "consider[s] Social Security and other insurers' determinations," they are not binding on Defendant's determination

12

whether a claimant meets the Policy's definition for Total Disability.  (*Id.*).

Other evaluators may use different guidelines or consider a different set of

medical evidence.  (*Id.*).  In this case, Defendant said, the Social Security

Administration did not have the results of Defendant's independent physician's

report or other medical and vocational information that Defendant had

developed.  (*Id.*).  Accordingly, Defendant denied Plaintiff's internal appeal.

## B.    Procedural Background

Having exhausted the administrative review procedures, *see Salisbury* v.

*Prudential Ins. Co. of Am.*, 238 F. Supp. 3d 444, 447-48 (S.D.N.Y. 2017)

(explaining that in any suit to recover ERISA benefits, an employee must

exhaust administrative review procedures, including by appealing to the plan

administrator), Plaintiff commenced this lawsuit in federal court.  She filed her

Complaint on May 29, 2024.  (Dkt. #2).  Defendant answered on August 5,

2024.  (Dkt. #9).  The parties attempted to resolve the case through private

mediation on November 20, 2024, but were ultimately unsuccessful.  (Dkt.

#16).

After the period to exchange discovery closed, both parties moved for

summary judgment.  Plaintiff filed her motion for summary judgment on

April 11, 2025.  (Dkt. #30).  The Court granted Plaintiff permission to file the

administrative record under seal (Dkt. #32), and she did so on April 14, 2025

(Dkt. #33).[4]  Later, on June 2, 2025, Plaintiff filed a Local Rule 56.1 Statement.

---

[4]     Although the Court repeatedly cites to the sealed administrative record throughout this
        Opinion, it does not include references to the personally identifying information
        contained in the record that in part motivated Plaintiff's sealing request.  (*See* Dkt. #32).

(Dkt. #35-1).  Defendant submitted its cross-motion for summary judgment and supporting papers (including its Local Rule 56.1 Statement) on May 10, 2025.  (Dkt. #34).  On June 10, 2025, Plaintiff submitted her reply brief and response to Defendant's Local Rule 56.1 Statement.  (Dkt. #37).  On June 27, 2025, Defendant submitted its reply brief and response to Plaintiff's Local Rule 56.1 Statement.  (Dkt. #40).

## DISCUSSION

### A.    Applicable Law

#### 1.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"It is the movant's burden to show that no genuine factual dispute exists" and a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor."  *Vt. Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).  If the movant has met its

---

But the Court does reference Plaintiff's medical information where necessary and appropriate.

14

burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" and, toward that end, "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal citations, quotation marks, and emphasis omitted).  The nonmoving party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).  "Where there are cross-motions, each motion must be evaluated separately, with the appropriate inferences drawn as to each movant."  *Prokos* v. *Full Stack LLC*, No. 23 Civ. 4960 (MMG), 2026 WL 572539, at *1 (S.D.N.Y. Mar. 2, 2026); *accord Walker* v. *Carrozzo*, 664 F. Supp. 3d 490, 505 (S.D.N.Y. 2023) (quoting *Byrne* v. *Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010)).

### 2.    The Standard of Review in ERISA Actions Involving Denial of Benefits

ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court."  *Metro. Life Ins. Co.* v. *Glenn*, 554 U.S. 105, 108 (2008); *see also* 29 U.S.C. § 1132(a)(1)(B) ("A civil action may be brought ... to recover benefits due to [the plaintiff] under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.").  Courts review such challenges to a denial of benefits pursuant to ERISA under a *de novo* standard, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone*

15

*Tire and Rubber Co.* v. *Bruch,* 489 U.S. 101, 115 (1989); *see also Glenn,* 554 U.S. at 111 ("Where the plan ... grant[s] the administrator or fiduciary *discretionary authority* to determine eligibility for benefits, [t]rust principles make a *deferential standard* of review appropriate." (internal quotation marks and citations omitted)). In such situations where the plan grants an administrator or fiduciary this discretionary authority, an arbitrary and capricious standard applies. *Firestone,* 489 U.S. at 115; *see also Duncan* v. *CIGNA Life Ins. Co. of N.Y.*, 507 F. App'x 61, 62 (2d Cir. 2013) (summary order) ("Where a plan gives the administrator 'authority to determine eligibility for benefits or to construe the terms of the plan,' we review the administrator's interpretation of benefits for abuse of discretion." (quoting *Firestone,* 489 U.S. at 115)). "The plan administrator bears the burden of proving that the arbitrary and capricious standard of review applies." *Kinstler* v. *First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999).

Even where the plan administrator has discretion to determine eligibility for benefits, a court must nevertheless review a denial of a claim for benefits *de novo* if the plan has failed to comply with the Department of Labor's claims-procedure regulation, 29 C.F.R. § 2560.503-1 — "unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent *and* harmless." *Halo* v. *Yale Health Plan, Dir. of Benefits & Recs. Yale Univ.*, 819 F.3d 42, 60-61 (2d Cir.

16

2016).  In that case, the standard of review is arbitrary and capricious.  *Id.* at 61.

## B.    Analysis

### 1.    The Court Reviews Defendant's Decision *De Novo*

In the current procedural posture, Plaintiff bears the burden of proving that she continues to be eligible for disability benefits. *See Critchlow* v. *First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 256-57 (2d Cir. 2004) (explaining that in ERISA cases, the insured has the burden of proving that a benefit is covered, while the insurer has the burden of proving that an exclusion applies).  Plaintiff advances two arguments for why the Court's review of Defendant's determination should be *de novo.*  Because the Policy granted Defendant discretion to determine benefits eligibility (AR 13), both arguments rely on *Halo*'s principle that the court reviews a denial of benefits *de novo* when a plan violates the Department of Labor's claims-procedure regulation and that violation is not inadvertent or harmless, *see Halo*, 819 F.3d at 60-61.  *First,* Plaintiff argues that Defendant refused to provide certain materials it relied upon to make its Decision, thus violating the claims-procedure regulation by failing to give Plaintiff a full and fair hearing.  (Pl. Br. 16-18).  *Second,* she argues that Defendant's decision was untimely under the claims-procedure regulation.  (*Id.* at 18-19).  The Court rejects Plaintiff's first argument but agrees with her second, and thus determines that a *de novo* standard of review applies.

### a.    Defendant Did Not Fail to Provide Materials It Relied Upon to Make Its Decision

Section 503 of ERISA requires that "every employee benefit plan shall … afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133; *see also Halo*, 819 F.3d at 48. The Department of Labor's claims-procedure regulation mirrors this requirement that a claimant is entitled to a "full and fair review" of a denied benefits claim. 29 C.F.R. § 2560.503-1(h)(1). The claims-procedure regulation further clarifies that such a full and fair review requires, among other things, that the plan "[p]rovide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits," including materials "relied upon in making the benefit determination." *Id.* § 2560.503-1(h)(2)(iii), (m)(8)(i).

Here, Plaintiff argues that Defendant failed to give her a full and fair review, thus violating the claims-procedure regulation and triggering *de novo* review, because it failed to provide her the materials it relied upon to determine her lifting capacity. (Pl. Br. 16-18). Specifically, Defendant found (through Dr. Blackmer) that Plaintiff could only lift up to five pounds occasionally. (Def. 56.1 ¶ 69). But Defendant's vocational expert concluded that Plaintiff could perform sedentary work (AR 493), which, Plaintiff says, Defendant defines as being able to lift up to ten pounds occasionally (Pl. Br. 17). So, in Plaintiff's view, Defendant's own definition of sedentary work disqualified her from

18

working in any capacity (thus making her eligible for benefits under the Policy) because she could only lift five pounds rather than ten.  (*See id.*; Def. 56.1 ¶ 76).  To make this point and challenge Defendant's denial of her benefits, Plaintiff therefore requested that Defendant provide "any materials referenced by [Defendant's] vocational review individual," particularly the information used to determine Plaintiff's lifting capacity.  (Def. 56.1 ¶¶ 75-76).

Defendant responded that its vocational team uses software that in turn "uses information obtained from the dictionary of occupational titles which has exertional/strength levels as defined by the Department of Labor."  (Def. 56.1 ¶ 77).  Although this response is somewhat convoluted, the parties' Local Rule 56.1 Statements clear things up:  Defendant drew its definition of "sedentary" from the Physical Demands section of the Dictionary of Occupational Titles, Fourth Edition, published in 1991 by the Department of Labor.  (*See id.* ¶¶ 79-80; AR 1291).

Plaintiff agrees that this is what Defendant told her.  (Pl. Br. 17 ("Defendant … stated it had relied on systems that obtain their definition from the Department of Labor's Dictionary of Occupational Titles[.]")).  She just does not believe Defendant.  (*See id.*).  That is, Plaintiff argues that it is "patently false" that Defendant relied on this definition of "sedentary" because she could not possibly meet this definition.  (*Id.* (arguing that Defendant's statement "is patently false as Defendant's own materials indicated the Dictionary of Occupational Titles defined sedentary work as requiring lifting up to 10 pounds" (citing AR 1291))).  But this is a substantive argument that Plaintiff is

19

entitled to benefits under the Policy, not a procedural argument that Defendant violated the Department of Labor's claims-procedure regulation by failing to provide her materials upon which it relied to make its Decision.  Plaintiff is free to make this argument when contending that Defendant should not have denied her benefits — indeed, she successfully does, as discussed below — but on this threshold question of the standard of review, her argument fails because it does not actually address whether Defendant violated the claims-procedure regulation.  *See Halo*, 819 F.3d at 60-61.

### b.    Defendant's Decision Was Untimely

Nevertheless, Plaintiff's second argument that the Decision was untimely successfully makes the case for *de novo* review.  (*See* Pl. Br. 18-19).  The claims-procedure regulation provides that once a plan denies an employee's benefits claim, the employee-claimant must be given at least 180 days to appeal that decision to the plan administrator.  29 C.F.R. § 2560.503-1(h)(3)(i).  Once an appeal is filed, the plan administrator has 45 days to render a decision.  *Id.* §§ 2560.503-1(i)(3)(i), 2560.503-1(i)(1)(i).  The plan administrator may request a single 45-day extension, but only if "the plan administrator determines that special circumstances (such as the need to hold a hearing, if the plan's procedures provide for a hearing) require an extension of time for processing the claim" and the plan administrator provides written notice describing the "special circumstances."  *Id.* § 2560.503-1(i)(1)(i).  Additionally, if either the initial 45-day window or the 45-day extension is further extended "due to a claimant's failure to submit information necessary

20

to decide a claim," the plan administrator's deadline to render a decision is "tolled from the date on which the notification of the extension is sent to the claimant until the date on which the claimant responds to the request for additional information." *Id.* § 2560.503-1(i)(4); *see also Salisbury*, 238 F. Supp. 3d at 447-48 (laying out this regulatory framework).

Defendant failed to meet these requirements of the claims-procedure regulation. Plaintiff submitted her internal appeal on December 6, 2023. (Def. 56.1 ¶ 61). Defendant then had 45 days, until January 20, 2024, to render a decision. 29 C.F.R. §§ 2560.503-1(i)(3)(i), 2560.503-1(i)(1)(i). On January 18, 2024, Defendant sent Plaintiff a letter stating that it would "take beyond 45 days to make a final decision on the appeal, as we are currently awaiting the independent medical review." (AR 484). Defendant contends that it successfully invoked the 45-day extension under 29 C.F.R. § 2560.503-1(i)(3)(i) because its wait for the independent medical review constituted "special circumstances." (Def. Br. 9-10). According to Defendant, its new decision deadline became March 5, 2024. (*Id.*).

Separately, on January 26, 2024, Defendant sent Plaintiff a letter confirming that the independent medical review was complete and advising Plaintiff as follows:

> If you wish to include any additional information, please do so no later than February 10, 2024. We will proceed with our review at that time, unless you provide additional information prior to that date.
>
> Please be aware that because statutory and internal guidelines set strict deadlines for completion of an appeal review, our request for additional information

21

> will toll the statu[to]ry time frames for reaching an appeal determination, from the time of our request until such time as we receive this information.

(AR 486). Eleven days later, on February 6, 2023, Plaintiff asked Defendant for the materials on which its vocational expert had relied to determine her lifting capacity and further told Defendant to "[p]lease proceed with your review." (*Id.* at 228). Defendant argues that this eleven-day period further tolled its deadline to render a decision, making its ultimate deadline March 16, 2024. (Def. Br. 10).

On March 26, 2024, Defendant rendered the final Decision and upheld its denial of Plaintiff's benefits under the Policy. (Def. 56.1 ¶ 83; AR 490-96). Defendant does not offer an excuse for this additional ten-day delay and instead says only that the delay was "harmless" and that Plaintiff "was not prejudiced in any way" because she had "waited two months to file her complaint" in the first place. (Def. Br. 11).

The Court rejects each of Defendant's arguments. Contrary to Defendant's position, its deadline under the claims-procedure regulation to decide Plaintiff's internal appeal was January 20, 2026. Defendant's decision was therefore 66 days late. (*See* Def. 56.1 ¶ 83). Consequently, Defendant violated the Department of Labor's claims-procedure regulation and, as explained below, those violations were neither inadvertent nor harmless. *See Halo*, 819 F.3d at 60-61.

*First*, Defendant's argument that it successfully invoked the 45-day extension under 29 C.F.R. § 2560.503-1(i)(3)(i) because its wait for the

22

independent medical review constituted "special circumstances" is wrong. Courts in this District are clear that a plan's written notice that it needs additional time to allow for physician or vocational review of a claimant's file is not a special circumstance. *See Salisbury*, 238 F. Supp. 3d at 449-50 ("[V]irtually every appeal of the denial of a disability benefits claim will require physician and vocational review, and thus this cannot constitute a valid special circumstance." (internal quotation marks omitted)); *Bianchini* v. *Hartford Life and Accident Ins. Co.*, No. 24 Civ. 6535 (JGLC), 2026 WL 810303, at *10 (S.D.N.Y. Mar. 24, 2026) ("[W]aiting on a physician's information, which is commonplace in insurance administrative proceedings, does not constitute good cause or a matter beyond [the plan's] control that justifies the violations of the ERISA regulations."); *Rappaport* v. *Guardian Life Ins. Co. of Am.*, No. 22 Civ. 8100 (JLR), 2024 WL 4872736, at *13 (S.D.N.Y. Nov. 22, 2024) ("Courts in this Circuit have routinely found that an extension to permit additional, routine review is not a special circumstance warranting extension." (collecting cases)).  Accordingly, Defendant failed to invoke the 45-day extension under 29 C.F.R. § 2560.503-1(i)(3)(i).

*Second*, even if it had successfully invoked the 45-day extension, Defendant's argument that it tolled the decision deadline by an additional 11 days while awaiting Plaintiff's February 6, 2024 response also falls flat.  The tolling provision, 29 C.F.R. § 2560.503-1(i)(4), would have kicked in if Defendant had notified Plaintiff that she had failed to submit information necessary to decide her claim.  *See id.*  But Defendant's January 26, 2024

23

letter did not provide this notification, and Plaintiff did not fail to submit necessary information, nor was Defendant waiting for it.

Defendant contends that its January 26, 2024 letter provided adequate notification under the tolling provision. (Def. Br. 10). To be sure, Defendant certainly intended to implicate the tolling provision: Its letter stated that its "request for additional information will toll the statu[to]ry time frames for reaching an appeal determination, from the time of our request until such time as we receive this information." (AR 486). But announcing the provision's application does not make it so. Defendant merely invited Plaintiff to provide "any additional information" if she "wish[ed]." (*Id.*). This description shows that the potential information was not "necessary to decide [Plaintiff's] claim." 29 C.F.R. § 2560.503-1(i)(4). Indeed, the letter's open-ended and permissive language makes clear that Defendant did not need the information and was merely advising Plaintiff that she had only two weeks to submit anything else she wished Defendant to consider before Defendant "proceed[ed] with [its] review." (AR 486). And the fact that Defendant said it would proceed with its review regardless of whether Plaintiff furnished additional information further demonstrates that this information was not necessary to decide her claim. Moreover, Defendant gets it completely backwards to suggest that *Plaintiff's* request for additional information *from Defendant* allowed for tolling, much less that Plaintiff's instruction to "proceed with your review" constituted the necessary information that stopped the tolling period. *See* 29 C.F.R. § 2560.503-1(i)(4) (providing a tolling period "due to a *claimant's* failure to

24

submit information necessary to decide a claim" (emphasis added)).  For these reasons, Defendant's tolling argument fails.

*Third*, even if the Court were to credit these other arguments, Defendant still violated the claims-procedure regulation by issuing its decision ten days after its purported revised deadline.  Defendant does not argue otherwise and instead claims only that this violation was harmless.  (Def. Br. 11).

Having outlined three ways in which Defendant violated the claims-procedure regulation, the Court now explains why these violations were not inadvertent or harmless.  *See Halo*, 819 F.3d at 60-61 (holding that the violations must be both inadvertent and harmless to trigger arbitrary and capricious review).  Defendant's claim that its wait for the independent medical review constituted "special circumstances" was not an inadvertent violation: a plan's violation is not inadvertent when the plan purposefully seeks an extension and provides inadequate grounds, just as Defendant did here.  *Salisbury*, 238 F. Supp. 3d at 451; *accord Aitken* v. *Aetna Life Ins. Co.*, No. 16 Civ. 4606 (PGG), 2018 WL 4608217, at *14 (S.D.N.Y. Sept. 25, 2018).  Defendant purposely invoked the 45-day extension under 29 C.F.R. § 2560.503-1(i)(3)(i), but its grounds for doing so (awaiting the independent medical review) were inadequate.  *See Salisbury*, 238 F. Supp. 3d at 449-50; *Bianchini*, 2026 WL 810303, at *10; *Rappaport*, 2024 WL 4872736, at *13.  Thus, Defendant's deadline to issue its Decision was January 20, 2024, and its failure to do so until March 26, 2024, triggers *de novo* review.

25

Further, Defendant's mistaken invocation of the tolling provision and its final ten-day delay trigger *de novo* review as well. Perhaps there is a colorable argument that any delay was harmless; Plaintiff did not lose her benefits during the delay, after all. *But see Halo*, 819 F.3d at 56-57 (holding that a plan must "strictly adhere" to the claims-processing regulation and positing that an inadvertent and harmless delay might be one hour or one day, not 10 or 66 days). However, because Defendant purposefully (albeit improperly) invoked the tolling provision, this violation was not inadvertent. *See Salisbury*, 238 F. Supp. 3d at 451; *Aitken*, 2018 WL 4608217, at *14. And Defendant's cursory defense of the final ten-day delay as "harmless" because Plaintiff was "not prejudiced in any way" is similarly unpersuasive. *See Halo*, 819 F.3d at 56-57; *id.* at 58 (holding that a plan, not the benefits claimant, bears the burden of proof to justify arbitrary and capricious review). The Court therefore proceeds to analyze Plaintiff's claim for long-term disability benefits under the Policy *de novo*.[5]

### 2.    Plaintiff Is Entitled to Long-Term Disability Benefits Under the Policy Because She Was Totally Disabled

Turning to the substance of Plaintiff's arguments, the Court concludes that Plaintiff was eligible for long-term disability benefits under the Policy because she met the definition of Totally Disabled. (Pl. Br. 19-20). To review, the Policy provides that after the first 60 months, Plaintiff qualifies as Totally

---

[5]    The Court's conclusion that *de novo* review applies is not dispositive, however. Even under a more deferential arbitrary and capricious standard of review, the Court would apply the same analysis explicated below to find that Plaintiff was Totally Disabled and entitled to long-term disability under the Policy.

26

Disabled if she could not "perform the material duties of any occupation." (Def. 56.1 ¶ 6)). "Any occupation is one that [her] education, training or experience will reasonably allow." (AR 9).

Both parties agree that Plaintiff could not lift more than five pounds. (Def. 56.1 ¶ 69; *see* Pl. Br. 17, 20 (accepting, at least for purposes of argument, Dr. Blackmer's conclusion that Plaintiff could only lift up to five pounds occasionally)). The critical inquiry, then, is whether a five-pound lifting capacity precluded Plaintiff from performing any occupation that her education, training, or experience would reasonably allow. Plaintiff says yes, her inability to lift more than five pounds means she was Totally Disabled. (*See* Pl. Br. 20). Defendant says no, a five-pound lifting capacity still allowed Plaintiff to perform some sedentary occupations. (*See* Def. Br. 16-17). Defendant defines a sedentary occupation (with reference to the Physical Demands section of the Department of Labor's Dictionary of Occupational Titles) as, in relevant part, "[e]xerting up to 10 pounds of force occasionally and/or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects[.]" (AR 1291). Defendant asserts that "[n]egligible weight includes anything lifted or carried weighing less than 1 pound." (Def. Br. 17 (alteration in original) (quoting U.S. Bureau of Labor Statistics, *Occupational Requirements Survey: Strength levels* (https://www.bls.gov/ors/factsheet/strength.htm#:~:text= Negligible%20weight%20includes%20anything%20lifted%)))).

27

Defendant agrees with Plaintiff that she cannot meet the first half of this definition because she can lift only up to five pounds, not ten. (*See* Def. Br. 16-17; Def. Reply 9). But Defendant argues that Plaintiff meets the second half of the definition because she can lift one pound frequently. (*See* Def. Br. 16-17; Def. Reply 9). And, citing its vocational expert, Defendant further argues that there are certain sedentary occupations Plaintiff can perform with this lifting capacity, which means she is not Totally Disabled. (*See* Def. Reply 8; AR 1289-98). As it happens, however, the sedentary occupations to which Defendant points only undercut its position.

Ultimately, Defendant presented three sedentary occupations it believed Plaintiff could perform: Cardiac Monitor Technician, Hospital-Admitting Clerk, and Telephone Triage Nurse. (AR 1289, 1296, 1298). But each of those occupations defines sedentary demands to include "Lifting, Carrying, Pushing, Pulling 10 Lbs. occasionally." (*Id.* at 1296, 1298).[6] They make no reference to exerting a negligible amount of force frequently. In consequence, a plain reading of the definitions of these sedentary occupations shows that one must be able to lift ten pounds occasionally to perform them. Both sides agree Plaintiff cannot do that. She therefore cannot perform these occupations, which are the only jobs Defendant points to in support of its position that she

---

[6]     Defendant's vocational expert did not provide a definition of Telephone Triage Nurse because that occupation was "not yet defined by the Department of Labor." (AR 1289).

Separately, because these occupations focus on only the first part of the definition of sedentary, the Court need not decide whether the two parts of Defendant's definition are disjunctive, as Defendant assumes them to be.

is not Totally Disabled.  It follows, then, that Plaintiff cannot perform any occupation, which means she was Totally Disabled under the Policy and entitled to long-term disability benefits.

This conclusion does not improperly shift the burden of proof onto Defendant.  *See Critchlow*, 378 F.3d at 256-57 (holding that plaintiff bears burden to prove eligibility for benefits).  Plaintiff submitted evidence and arguments in her internal appeal and before this Court.  She argued that her five-pound lifting capacity — a capacity both parties agree on — precluded her from even sedentary work.  These arguments and evidence were sufficient to meet her burden, and the Court's rejection of Defendant's counterarguments and contrary interpretations does not improperly shift that burden onto Defendant.  *Cf. United States* v. *Truman*, 581 F. App'x 26, 30-31 (2d Cir. 2014) (summary order) (explaining that a prosecutor does not shift the burden by simply pointing out that a defendant's theory of the case lacks evidentiary support).[7]

---

[7]    The parties' remaining arguments warrant only brief discussion.  *First,* the parties debate whether Plaintiff's condition improved (as Defendant claims), and how that affects whether she was Totally Disabled.  (Pl. Br. 20-22; Def. Br. 17-23).  The Court need not resolve this dispute because both parties agree that, no matter her other disabilities, Plaintiff could only lift a maximum of five pounds.  As just explained, this limitation sufficiently demonstrates that Plaintiff was Totally Disabled.

*Second,* Plaintiff argues that Defendant deprived her of a full and fair hearing by failing to acquire the file from her Social Security Administration case (the "File").  (Pl. Br. 22-25).  The Court rejects this argument, but in doing so does not disturb its ultimate conclusion that Plaintiff is entitled to benefits under the Policy.

Plaintiff's argument begins with 29 C.F.R. § 2560.503-1(j)(6)(i)(C), which provides:  "In the case of an adverse benefit decision with respect to disability benefits," the plan administrator shall provide the claimant "[a] discussion of the decision, including an explanation of the basis for disagreeing with or not following … [a] disability determination regarding the claimant presented by the claimant to the plan made by the Social Security Administration."  But Defendant abided by this regulation:  it

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED and Defendant's cross-motion for summary judgment is DENIED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      March 30, 2026
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

---

discussed Plaintiff's Social Security Administration decision and explained how and why its decision differed.  (AR 495).

Recognizing that § 2560.503-1(j)(6)(i)(C) does not require Defendant to have obtained Plaintiff's File but only to distinguish the decisions, Plaintiff also relies on 29 C.F.R. § 2560.503-1(h)(2)(ii), which mandates that "a full and fair review" must "[p]rovide claimants the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits."  Plaintiff reasons from this subsection that Defendant had to acquire her File, but the text does not support her argument. Subsection 2560.503-1(h)(2) requires only that Defendant permit Plaintiff the opportunity to provide the File, not that Defendant itself acquire that File.  And in fact, Defendant contends that it *was* "in possession of the Social Security opinion that detailed the basis for the award."  (Def. 56.1 ¶ 50 (citing AR 847-948)).  It is not clear to the Court from the record whether Defendant is correct on this point, but that imprecision ultimately does not matter:  Defendant did not need to acquire the File, and regardless of whether it did, Plaintiff is entitled to benefits under the Policy because she was Totally Disabled, as explained above.